IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,    )
                              )      CRIMINAL ACTION NO.
      Plaintiff,           )      1:08-CR-433-JEC-LTW
                              )
v.                           )
                              )
ANTONIO DARNELL KING,    )
                              )
      Defendant.        )

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Currently before the Court is Defendant Antonio King's ("Defendant") Motion to Suppress Statements. Docket Entry [10]. For the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**. Docket Entry [10].

## PROCEDURAL BACKGROUND

On October 28, 2008, a grand jury sitting in the Northern District of Georgia returned an Indictment against Defendant charging him with two counts of aggravated assault on a Deputy United States Marshal in violation of Title 18, United States Code, Section 111(b). Docket Entry [1]. Specifically, the Indictment alleges in Count One that on or about April 18, 2008, Defendant "by use of a deadly or dangerous weapon,

knowingly and willfully did forcibly assault, resist, oppose, impede, intimidate, and interfere with Deputy U.S. Marshal James Ergas while he was engaged in and on account of the performance of his official duties," in violation of Title 18, United States Code, Sections 111(a)(1) and (b). Docket Entry [1]. Count Two alleges that on or about April 24, 2008, Defendant committed the same crime upon a different Deputy U.S. Marshal, Jeff May. Docket Entry [1]. According to the Government, the "deadly or dangerous weapon" on both dates was the vehicle Defendant was driving. Docket Entry [1].

On November 23, 2008, Defendant filed a Motion to Suppress Statements arguing that all statements made by him to law enforcement officers on or about April 24, 2008, should be suppressed because his statements were not voluntary. Docket Entry [10]. Defendant also argues that he was not capable of knowingly, voluntarily, and intelligently waiving his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) given the circumstances surrounding his apprehension. Docket Entry [10]. On January 12, 2008, this Court held an evidentiary hearing on Defendant's motion. Docket Entry [23]. Six members of the United States Marshal's Service task force for apprehending fugitives testified, including Deputy U.S. Marshal ("DUSM") James Ergas, ATF Special Agent ("SA") Joel Sheppard, Task Force Officers ("TFOs") Frederick Myrick, Marshall Smith, and Joseph Garland, and Task Force Commander ("TFC") Keith Booker. Docket

2

Entry [23]. After the evidentiary hearing, Defendant filed a brief in support of his motion to suppress. Docket Entry [50]. Thereafter, the Government filed a response in opposition to Defendant's motion to suppress, and Defendant filed a reply to the response. Docket Entry [53 and 55]. After numerous extensions of time, this matter is now ripe for a ruling.

## FACTUAL BACKGROUND

### 1.    The Plan to Apprehend Defendant

On April 18, 2008, members of the Southeast Regional Task Force of the United States Marshal's Service ("TFOs") unsuccessfully attempted to execute an arrest warrant on Defendant for violating the terms and conditions of his supervised release. (Transcript of Suppression Hearing, January 13, 2009 ("Tr.") at 19, 68). Docket Entry [27]. On April 24, 2008, the TFOs successfully apprehended Defendant, pursuant to an arrest warrant, on a bridge on Norman Berry Road near Virginia Avenue. (Tr. at 11, 68). DUSM Ergas, Supervisor Inspector of the Southeastern Regional Task Force in Atlanta, directed the attempt to arrest Defendant on April 24, 2008. (Tr. at 10-12). The task force had at least eight law enforcement vehicles and eight officers present as they prepared to apprehend Defendant. (Tr. at 57). None of the vehicles had police markings, and all of the officers involved wore plain clothes. (Tr. at 143).

DUSM Ergas testified that on April 24, 2008, the TFOs planned to apprehend Defendant in his car after he dropped off his girlfriend at her place of employment. (Tr. at 11-12, 50-52). The officers observed Defendant leave his girlfriend at her place of employment between 4:30 p.m. and 5:00 p.m. (Tr. at 51). Defendant initially drove over a two-lane overpass on Norman Berry Drive near Virginia Avenue, made a U-turn, and came back over the bridge. (Tr. at 11). DUSM Ergas alerted the task force units to isolate Defendant's car on the bridge. (Tr. at 12). The TFOs blocked both lanes of traffic on the bridge by parking in front of and behind Defendant to prevent him from escaping. (Tr. at 12). DUSM Ergas believed that the bridge was an excellent "choke point" to apprehend Defendant. (Tr. at 12). DUSM Ergas testified that although the officers' vehicles were directly approaching Defendant with their emergency equipment activated, he did not stop. (Tr. at 12). Instead, Defendant veered to the right to avoid a head-on collision with TFO Jeff May, one of the officers in pursuit. (Tr. at 12). Believing that a head-on collision was imminent, DUSM Ergas veered his truck to the right, struck Defendant's vehicle causing it to be pushed across the roadway, and onto a curb where it stopped. (Tr. at 12).

Once DUSM Ergas immobilized Defendant's vehicle, he, along with three TFOs, some armed with tasers and others with firearms drawn, ran to Defendant's side of the

4

car. (Tr. at 34, 62, 127). DUSM Ergas testified that as he approached Defendant's car, he repeatedly shouted commands for Defendant to open the door, get out of the car, and show his hands. (Tr. at 13, 63). DUSM Ergas testified that Defendant exited his vehicle, and instead of complying with his commands and going to the ground, Defendant turned around with this right hand balled into a fist, and his left hand "going up around his waist."[1] (Tr. at 13).

## 2.    **The Tasering of Defendant**

Five to ten seconds after Defendant exited his vehicle, DUSM Ergas fired his taser at Defendant. (Tr. at 14, 136). TFOs Myrick, Smith, and Garland also simultaneously fired their tasers at Defendant. (Tr. at 14, 23, 123). Each officer fired a Taser X26 model in probe mode.[2] (Tr. at 7, 23). DUSM Ergas explained that he tasered Defendant

---

[1]DUSM Ergas and TFOs Myrick and Smith testified that Defendant opened the door and exited his vehicle on his own. (Tr. at 13-14, 124, 145). TFO Garland testified that while Defendant was on his way out of the vehicle with one foot one the ground, he was pulled out of the vehicle. (Tr. at 168).

[2]DUSM Ergas testified that the Taser's probes can be "fired" or used in "drive stun mode." (Tr. at 6-8). DUSM Ergas explained that the "drive stun" mode is when the darts are already fired and someone takes the actual taser and drives the device into a target. (Tr. at 7). When the taser is driven into a target it causes pain which results in compliance by the target, but does not lock up their muscles. (Tr. at 6-8). On the other hand, if the probes are fired, as in this case, the target experiences a pain sensation in the areas affected by the probes followed by a neuromuscular response which locks up their muscles. (Tr. at 8).

AO 72A
(Rev.8/82)

because Defendant failed to comply with his commands, and because he had his right hand balled into a fist and left hand near his waist. (Tr. at 14, 71). TFO Myrick testified that he tasered Defendant because of the abrupt manner in which Defendant exited his car made him believe that Defendant was going to run or charge the officers. (Tr. at 130). TFO Myrick further testified that Defendant "was in like a violent position, his hands clinched and moving very quickly out of his vehicle." (Tr. at 130). TFO Smith testified that he tasered Defendant because Defendant failed to get on the ground when commanded and because he believed Defendant was going to try to escape by running around the front of the car. (Tr. at 145). TFO Smith also testified that he saw Defendant's right hand and that it was clenched, but could not see his left hand. (Tr. at 145). TFO Garland also appeared and testified that Defendant was given the command to show his hands and get on the ground. (Tr. at 166-67). TFO Garland also testified that he tasered Defendant because Defendant was not compliant, his right hand was not in view, it appeared that Defendant was attempting to flee, Defendant had a history of fleeing, and the vehicle had already been assaultive [earlier that day].[3] (Tr. at 167-68). According to TFO Garland, he used his taser "to end the threat and gain control of the

---

[3]TFO Garland explained that the vehicle had already been in a collision that day. (Tr. at 167). This Court assumes TFO Garland meant with DUSM Ergas' vehicle. (Tr. at 167).

6

situation." (Tr. at 167). TFO Garland also used his taser rather than his firearm because in accordance with the "use of force continuum" the taser was the appropriate choice. (Tr. at 168). DUSM Ergas testified that tasers are designed to create control over suspects. (Tr. at 22). In DUSM Ergas' opinion, part of the way the officers create control is that they "evoke[] a 'fear response in the subject." (Tr. at 30).

After the officers fired their tasers, Defendant fell to the concrete on his side. (Tr. at 16, 76). DUSM Ergas thought that all four (4) sets of probes hit Defendant, though perhaps one didn't "engage him." (Tr. at 15, 24). Most of the taser probes (or "darts") struck Defendant in his upper body. (Def's Exs. 5, 14-16; Tr. at 44). After Defendant had been tasered multiple times to the torso and face, he was bleeding from the right temple. (Tr. at 72). DUSM Ergas testified that being tasered is painful.[4] (Tr. at 6). DUSM Ergas observed at least four probes still stuck in Defendant after he was handcuffed – one in his back, one under his arm, one in his chest, and one in his right

---

[4]Each officer testified that they had been tasered in training. (Tr. at 9, 134). However, none of the officers had been tasered multiple times simultaneously. (Tr. at 9, 137, 104). TFO Myrick said that when he was tasered he experienced "a lot of pain and [that] it immobilize[d] all [of his] muscles." (Tr. at 134). DUSM Ergas testified that in his experience, after the tasering is complete, the pain decreases and the neuromuscular response ends. (Tr. at 7-8).

AO 72A
(Rev.8/82)

temple.[5]  (Tr. at 72).  TFO Garland testified that once Defendant was on the ground, Defendant continued to resist to some degree, and it took a few seconds to manually get Defendant's hands behind his back to cuff him.  (Tr. at 169).  Defendant did not strike anyone, and did not have a gun or any other weapon on his person or in his vehicle.  (Tr. at 105).

In addition to Defendant being tasered, a male passenger in Defendant's vehicle who failed to comply with orders was tasered by TFO Garland.  (Tr. at 172).  TFO Garland testified that he got the passenger's attention, told him to open the door, and do what the other officers told him to do.  (Tr. at 172).  According to TFO Garland, instead of the passenger reaching up for the door handle, the passenger reached down between the seat and the door.  (Tr. at 172).  Two darts were fired from TFO Garland's weapon hitting the passenger.  (Tr. at 172).

---

[5]The normal cycle of the X26 Taser is five seconds.  (Tr. at 8).  DUSM Ergas testified that he downloaded the report from his taser, per his agency's policy, which showed a full five second cycle had run.  (Tr. at 78-79).  The other officers were not required by their agencies to download their reports.  (Tr. at 79, 132, 147).  TFO Myrick believes his taser ran through a complete five second cycle.  (Tr. at 131).  TFO Smith also testified that his taser went through a full cycle.  (Tr. at 147).  Conversely, TFO Garland testified that he manually stopped his taser after a couple of seconds, but did not view the report from his taser.  (Tr. at 170).

8

**3.** **Defendant's Statement**

After Defendant was handcuffed, he began conversing with the investigators. (Tr. at 17). According to DUSM Ergas, Defendant spontaneously stated that earlier on April 18, 2008, he knew it was the police trying to apprehend him, and that he had his twelve-year-old son in the car with him when he fled. (Tr. at 19, 86-87). DUSM Ergas noticed Defendant becoming more talkative, so he walked off and retrieved his <u>Miranda</u> card. (Tr. at 17). DUSM Ergas also asked SA Sheppard to come over and witness him <u>Mirandizing</u> Defendant. (Tr. at 17). DUSM Ergas read Defendant his <u>Miranda</u> rights from a plastic laminated card issued by the Marshals' Service. (Tr. at 17). At that time, no officers had questioned Defendant. (Tr. at 17). DUSM Ergas read Defendant the following:

> [B]efore we ask [you] any questions, it's my duty to advise you of your rights. You have the right to remain silent. Anything you say can and will be used against you in a criminal proceeding. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning begins. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand your rights?

(Tr. at 18). DUSM Ergas asked Defendant if he understood, and Defendant verbally

9

stated that he understood. (Tr. at 19). SA Sheppard witnessed Defendant DUSM Ergas reading Defendant his Miranda rights and Defendant's affirmative response when asked if he understood his rights. (Tr. at 18, 111-12). DUSM Ergas did not believe that he read the last sentence on the card that states "Are you willing to waive your rights and talk with us?" because he did not have any questions for Defendant. (Tr. at 19, 95, 98).

When Defendant was read his Miranda rights and indicated that he understood them, DUSM Ergas described Defendant as attentive, talkative, friendly, laughing, entertaining and stated that Defendant made jokes about his apprehension. (Tr. at 20, 83, 87). There was nothing about Defendant's behavior that gave the officers any indication that Defendant had any lingering effect from the use of the tasers on him. (Tr. at 21). DUSM Ergas does not recall if the probes were still in Defendant's head and body or had been removed by EMS prior to Defendant being Mirandized. (Tr. at 98). After Defendant was read his Miranda rights, DUSM Ergas asked Defendant if he "want[ed] to know what this [was] all about." (Tr. at 112). DUSM Ergas also asked Defendant what was he doing when he got out of the car, why did he turn away, and why did he do what he was doing. (Tr. at 19). Defendant responded that he had his hand by his waist because he was trying to pull his pants up. (Tr. at 19). According to DUSM Ergas, Defendant repeated his earlier admission that he knowingly fled from the officers on

10

April 18, 2008. (Tr. at 99). Defendant allegedly stated that he knew it was the police [who had come to arrest him] earlier [on April 18, 2008], and that he had his twelve-year-old son in the car with him when he ran. (Tr. at 99-100). DUSM Ergas responded that he was surprised that Defendant would drive the way that he did and risk the lives of others when his son was in the car. (Tr. at 88). DUSM Ergas also testified that after Defendant was advised of his <u>Miranda</u> rights and handcuffed, he got up and said "I know what you guys were thinking." (Tr. at 84). DUSM Ergas responded "what were we thinking?" (Tr. at 84). DUSM Ergas testified that Defendant while laughing and smiling said "We got that bitch now." (Tr. at 84). DUSM Ergas told Defendant that he believed Defendant had tried to hit him with Defendant's car during their April 18, 2008 encounter. (Tr. at 88). DUSM Ergas believed that by his conduct on April 18, 2008, Defendant created a situation that could have caused DUSM Ergas to be badly injured, and one that could have injured a lot of people. (Tr. at 88). DUSM Ergas testified that while he was not particularly angry with Defendant, he felt like his life was in danger during his April 18, 2008 encounter with Defendant because he was almost struck by Defendant's vehicle. (Tr. at 89).

After Defendant's arrest, DUSM Ergas called EMS right away. (Tr. at 19-20). TFO Myrick testified that the EMTs arrived within five to ten minutes of the collision.

AO 72A
(Rev.8/82)

(Tr. at 135). The EMTs removed the probes and examined Defendant and the passenger. (Tr. at 103, 136). The EMTs later told DUSM Ergas that the passenger and Defendant were fine. (Tr. at 103). Thirty to forty-five minutes after the collision, Defendant was transported to the Atlanta Pretrial Detention Center. (Tr. at 118). No weapons or guns were found during a subsequent search of Defendant's vehicle. (Tr. at 105).

## DEFENDANT'S MOTION TO SUPPRESS

Defendant seeks to suppress statements made before and after he was advised of his Miranda rights arguing that they were not voluntarily made. (Defendant's Post-Hearing Brief in Support of Motion to Suppress Statements ("Def.'s Brf.") at 13), Docket Entry [51]. In support, Defendant contends that his statements were made just after a car accident, and after he had been tasered four times. (Def.'s Brf. at 14). In addition, Defendant argues, he was in the custody of multiple officers, all of whom were armed. Id. Defendant also argues that he was interrogated while cuffed and before medical treatment was rendered. Id. Lastly, Defendant contends that the Government failed to prove that he voluntarily made a knowing and intelligent waiver of his Miranda rights; therefore, any post-arrest statements are inadmissible. (Def.'s Brf. at 21). The Government argues in response that Defendant's admissions were not coerced and that Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

12

### 1.      <u>Defendant's Pre-Miranda Statements</u>

Defendant contends that his statements to the officers were not voluntarily made because the circumstances leading to his interrogation were marked by the use of force and were fundamentally coercive.  In support, Defendant asserts that after the collision with DUSM Ergas' vehicle, numerous officers surrounded his car with firearms and tasers drawn, yelling commands at him, and after he exited his vehicle, he was tasered four times simultaneously.  Defendant also contends that the stressful experience he had just gone through and the physical effects of the tasers, rendered him vulnerable to the officers' pressuring him to speak.  Thus, Defendant argues, under these circumstances, his statements could not be the product of a free and rational choice.  In contrast, the Government argues Defendant's statements are admissible because Defendant voluntarily initiated conversation with the arresting officers before he was informed of his <u>Miranda</u> rights.

The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibit the use of an involuntary confession against a defendant in a criminal trial.  U.S. CONST. amend. V; U.S. CONST. amend. XIV, cl. 3; <u>Dickerson v. United States</u>, 530 U.S. 428, 434-35 (2000); <u>Bram v. United States</u>, 168 U.S. 532, 542, (1897); <u>United States v. Vera</u>, 701 F.2d 1349, 1365 (11th Cir. 1983).  The

Supreme Court has consistently stated that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." Rhode Island v. Innis, 446 U.S. 291, 299 (1980). When the government seeks to use a confession obtained through custodial interrogation against a defendant, it must demonstrate that the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights under Miranda. Miranda, 384 U.S. at 475; Hart v. Florida, 323 F.3d 884, 891 (11th Cir. 2003). Whether a waiver was voluntary, knowing, and intelligent presents a two-fold inquiry. Courts assess the voluntariness of the defendant's relinquishment of his rights to see if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Hart, 323 F.3d at 892. To determine whether the relinquishment was knowing and intelligent, courts must determine whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421. A court may only hold that a defendant validly waived his Fifth Amendment rights under Miranda if it finds that "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." Id.

AO 72A
(Rev.8/82)

The totality of the circumstances test takes into consideration both the characteristics of the accused and the details of the interrogation to determine whether police conduct was causally related to the confession. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also Haynes v. Washington, 373 U.S. 503, 513 (1963); Reck v. Pate, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account."). The court reviews numerous factors under this analysis, including the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well as the length of the detention, the nature of the interrogation, the application of physical force or the threat thereof, and the use of a promise or inducement by police. Hubbards v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) (citing United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). The court must find government coercion in order to conclude that a waiver was involuntary. United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). "Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant" of his rights. Colorado v. Connelly, 479 U.S. 157, 164 (1986); Barbour, 70 F.3d at 585.

Applying the law to the facts of this case, this Court finds that the Government established during the evidentiary hearing that Defendant's statements were not obtained

AO 72A
(Rev.8/82)

in violation of either the Constitution or <u>Miranda</u>. This Court finds Defendant's pre-

<u>Miranda</u> statements admissible because the statements were the product of his free

choice. The record reveals that on July 24, 2009, DUSM Ergas and Defendant's vehicle

collided on the bridge. (Tr. at 12). DUSM Ergas testified that as the officers' vehicles

were directly approaching Defendant with their emergency equipment activated

Defendant did not stop. (Tr. at 12). Instead, Defendant veered to the right to avoid a

head on collision with TFO May. (Tr. at 12). DUSM Ergas veered his truck to the right,

struck Defendant's vehicle causing it to be pushed across the roadway, and onto a curb

where it stopped to avoid what he thought was going to be a head-on collision. (Tr. at

12). Once DUSM Ergas immobilized Defendant's vehicle, he, along with four TFOs,

some armed with tasers and others with firearms drawn, ran to Defendant's side of the

car. (Tr. at 34, 62, 127). DUSM Ergas testified that as he approached Defendant's car,

he repeatedly shouted commands for Defendant to open the door, get out of the car, and

show his hands. (Tr. at 13, 63). DUSM Ergas testified that Defendant exited his vehicle,

and instead of complying with his commands, and going to the ground, Defendant turned

around with this right hand balled into a fist, and his left hand "going up around his

waist." (Tr. at 13). This Court notes that this was not the first encounter some of the

officers had with Defendant. Several days earlier, on April 18, 2008, Defendant fled

16

from the officers in his vehicle almost striking DUSM Ergas in the process. (Tr. at 89).

Based on Defendant's previous conduct in almost striking an officer on April 18, 2008, his failure to obey the officer's command to show his hands and get on the ground, and his defensive posture (i.e. right hand balled into a fist and left hand near his waist), DUSM Ergas and three other TFO's used their tasers to subdue and arrest Defendant. The record reveals that Defendant was tasered simultaneously by four officers in different places on his body, including his face. (Tr. at 14). It is readily apparent from the testimony of the officers and this Court's review of the pictures of Defendant (Def's Exs. 5, 14-16) that the simultaneous use of multiple tasers was not only violent, but also painful. However, based on the totality of the circumstances presented, the undersigned is not able to conclude that the officers' actions created a coercive environment that mentally and physically impaired Defendant enough to cause him to make inculpatory statements. The amount of force used by the officers appeared to have been based on the circumstances presented. The officers' conduct in blocking both lanes of traffic on the bridge by parking in front of and behind Defendant was done to apprehend him. (Tr. at 12). DUSM Ergas' conduct in striking Defendant's vehicle was performed to prevent a head-on collision. (Tr. at 12). The officers' conduct in simultaneously tasering Defendant, albeit violent and painful, was done to require Defendant's compliance with

17

DUSM Ergas' commands, ensure the safety of the officers, prevent Defendant from escaping, and gain control of the situation. (Tr. at 14, 71, 130, 145, 167-68). Indeed, DUSM Ergas testified that he tasered Defendant because Defendant failed to comply with his commands, and because he had his right hand balled into a fist and left hand near his waist. (Tr. at 14, 71). TFO Myrick testified that he tasered Defendant because of the abrupt manner in which Defendant exited his car made him believe that Defendant was going to run or charge the officers. (Tr. at 130). TFO Myrick also stated that Defendant "was in like a violent position, his hands clinched and moving very quickly out of his vehicle." (Tr. at 130). Likewise, TFO Smith testified that he tasered Defendant because Defendant failed to get on the ground when commanded and because he believed Defendant was going to try to escape by running around the front of the car. (Tr. at 145). TFO Smith also testified that he saw Defendant's right hand and that it was clenched, but could not see his left hand. (Tr. at 145). TFO Garland testified that he tasered Defendant because Defendant was not compliant, Defendant's right hand was not in view, it appeared that Defendant was attempting to flee, Defendant had a history of fleeing, and the vehicle had already been assaultive [earlier that day]. (Tr. at 167-68). TFO Garland also stated that he used his taser "to end the threat and gain control of the situation." (Tr. at 167). This Court finds DUSM Ergas' and the TFOs' testimony

18

regarding Defendant's conduct before and after being tasered to be credible. Thus, the arresting officers' conduct that caused injuries to be inflicted on Defendant resulted from their attempts to require Defendant to comply with DUSM Ergas' orders and control Defendant's movement. Defendant was not tasered to render him mentally and physically vulnerable to the officers' subsequent questioning. Indeed, after being tasered simultaneously by multiple officers, Defendant continued to resist [arrest] to some degree, and it took a few seconds to manually get Defendant's hands behind his back to cuff him. (Tr. at 169). There was no evidence presented that indicates that, after Defendant was tasered and subdued, the officers threatened Defendant or subjected him to any type of force to compel him to make statements or a confession. Accordingly, this Court finds that the magnitude of force and the number of officers used in the instant action does not render Defendant's pre-<u>Miranda</u> statements inadmissible. <u>See</u> <u>United States v. Mack</u>, No. 07-238, 2009 WL 580430 (M.D.La. Mar. 6, 2009)(noting that while law enforcement used a taser to subdue the defendant, the force used was due to defendant's efforts to avoid arrest, and after his arrest, "no officer or agent threatened the defendant with electrocution or any other type of force to compel him to make a statement or confession"); <u>see</u> <u>also</u> <u>United States v. Smith</u>, 210 F. App'x. 533, 534 (7th Cir. 2006) (where arresting officers inflict injuries solely to bring suspects into

19

compliance with police orders and not as a form of interrogation, arrest-related injuries do not necessarily vitiate a suspect's valid consent).

Furthermore, Defendant's demeanor after being tasered belies his argument that his statements were coerced or otherwise involuntary. After being tasered, Defendant was described as attentive, talkative, friendly, laughing, entertaining, and Defendant joked about his apprehension. (Tr. at 20, 83, 87). There was nothing about Defendant's behavior that gave the officers any indication that Defendant had any lingering effect from the use of the tasers on him. (Tr. at 21). The officers' testimony that Defendant did not have any lingering effects of the tasers is supported by the fact that five to ten minutes after the accident EMTs arrived, removed the probes, examined Defendant and the passenger, and later told the officers that both were fine. (Tr. at 103, 135-36). Moreover, the fact that thirty to forty-five minutes after the collision, Defendant was transported to the Atlanta Pretrial Detention Center, lends credence to the fact that Defendant did not have any lingering effects after being tasered. (Tr. at 118).

Lastly, this Court finds Defendant's initial statements to the officers were spontaneous, rational and were not the product of interrogation. DUSM Ergas testified the Defendant while handcuffed on the ground, began conversing with the investigators. (Tr. at 17). Because DUSM Ergas noticed Defendant becoming more talkative, he

20

walked off and retrieved his <u>Miranda</u> card. (Tr. at 17). DUSM Ergas heard Defendant

utter spontaneous statements regarding his April 18, 2008 encounter with officers. (Tr.

at 19, 86-87). DUSM Ergas' testimony that he was unaware of anyone asking Defendant

questions to illicit a response was not contradicted by any record evidence. (Tr. at 17).

Thus, Defendant's initial spontaneous statements to the officers were totally voluntary

and clearly outside the protective umbrella of <u>Miranda</u>. <u>See</u> <u>Miranda v. Arizona</u>, 384

U.S. at 478. (holding that volunteered statements of any kind are not barred by the Fifth

Amendment); see also <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir. 1991) ( In the

absence of interrogation by law enforcement, "[v]oluntary and spontaneous comments

by the accused, even after <u>Miranda</u> rights are asserted, are admissible evidence.").

Accordingly, Defendant's pre-<u>Miranda</u> statements should be admissible.

### 2. <u>Defendant's Post-Miranda Statements</u>

Defendant also argues that his post-<u>Miranda</u> statements should be suppressed

because the officers employed a strategy of deliberately questioning him without

<u>Miranda</u> warnings in an effort to get a confession, and deliberately did not ask him if he

wished to waive his <u>Miranda</u> rights before questioning him.[6]   This Court finds

---

[6]Although Defendant also argues his post-<u>Miranda</u> statements should be
suppressed because he was subjected to the excessive force, this Court has already
addressed the agents' use of force, and has determined the magnitude of the force did not

21

Defendant's arguments to be without merit. There was no evidence presented that indicates the officers employed a strategy to question Defendant without informing him of his <u>Miranda</u> warnings to illicit incriminating statements from him.  As previously addressed, Defendant's initial statements to the officers were spontaneous and voluntarily provided.  The record does not support Defendant's contention that he was interrogated or that the officers engaged in any conduct designed to illicit incriminating statements from him prior to receiving his <u>Miranda</u> warnings.  Defendant initiated the pre-<u>Miranda</u> conversation, not the officers.

"The term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. at  301.

_____

render Defendant's statements inadmissible.  This Court also rejects Defendant's argument that his statement was not voluntary because he was not apprised of the nature of the charges filed against him, and did not know the TFOs had a warrant for his arrest. DUSM Ergas asked Defendant if he wanted to know the reason for his arrest.  (Tr. at 112).  Also, by Defendant's own admission he knew that on April 18, 2008, the officers were attempting to arrest him when he fled with his son in the car.  (Tr. at 99-100).  The fact that Defendant may not have known the offense for which he was being charged did not render his post-<u>Miranda</u> statements inadmissible.  <u>Miranda</u> requires only that a person be advised of his right to remain silent and his right to counsel before he is interrogated.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444.

AO 72A
(Rev.8/82)

An express written or oral waiver "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." U.S. v. Toyer, 274 F. App'x. 844, 846 (11th Cir. 2008) quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979). A suspect can also make an implied waiver of his Miranda rights. Jacobs v. Singletary, 952 F.2d 1282, 1295 (11th Cir. 1992). [Courts] may consider the initiation of dialogue as a factor when determining whether a waiver was voluntary. Id.

Applying the law to the facts of this case, this Court finds that Defendant was adequately advised of his Miranda rights, understood those rights, waived his Miranda rights, and understood the consequences of waiving those rights. DUSM Ergas read Defendant his Miranda rights from a plastic laminated card issued by the Marshals Service. (Tr. at 17). DUSM Ergas read Defendant the following:

> [B]efore we ask [you] any questions, it's my duty to advise you of your rights. You have the right to remain silent. Anything you say can and will be used against you in a criminal proceeding. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning begins. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand your rights?

23

(Tr. at 18). DUSM Ergas asked Defendant if he understood, and Defendant stated that he understood. (Tr. at 19). ATF Agent Sheppard witnessed DUSM Ergas reading Defendant his <u>Miranda</u> rights and Defendant's affirmative response when asked if he understood his rights. (Tr. at 18, 111-12). Although DUSM Ergas did not ask Defendant if he was willing to waive his rights and talk with the officers, by his words and actions, Defendant impliedly waived his rights under <u>Miranda</u>. Defendant's decision to speak to the officers was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Defendant did not exercise his right to remain silent or request a consultation with an attorney. Instead, after stating he understood his rights, Defendant repeated his previous statement regarding fleeing from the officers on April 18, 2008, with his son in the car. (Tr. at 99-100). Defendant also admitted that he reached for his waist (albeit to pull up his pants) when he exited his vehicle after the collision. (Tr. at 19). Defendant also voluntarily commented to the officers that the agents were probably thinking "we got that bitch now." (Tr. at 84). There was no evidence presented that at the time Defendant waived his <u>Miranda</u> rights, he was still under the lingering effects of the multiple tasering. As previously discussed, Defendant's friendly and joking demeanor prior to making incriminating statements belies his argument that his waiver was not voluntarily, knowingly, and intelligently

AO 72A
(Rev.8/82)

given. Nothing in the record suggests that Defendant was unaware of the nature of his rights or the consequences of abandoning them. <u>See</u> <u>United States v. Gonzalez</u>, 833 F.2d 1464, 1466 (11th Cir. 1987) (where suspect, fully advised of her rights, made no request for appointed counsel or the presence of counsel and confessed, she impliedly waived her right to counsel and the district court properly admitted her confession). Accordingly, the totality of the circumstances surrounding Defendant's interrogation reveal both an uncoerced choice and the requisite level of comprehension for this Court to conclude that Defendant's <u>Miranda</u> rights were waived. <u>See</u> <u>United States v. Middleton</u>, 245 F. App'x 867 (11th Cir. 2007) (holding that threshold showing that defendant was advised of his <u>Miranda</u> rights was satisfied, and totality of the circumstances established defendant voluntarily waived his <u>Miranda</u> rights before admitting ownership of gun).

## **<u>CONCLUSION</u>**

Based on the foregoing, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**. Docket Entry [10].

There are no further motions pending before the undersigned to prevent the scheduling of this case for trial. As such, this Court hereby certifies this criminal action

AO 72A
(Rev.8/82)

ready for trial.

**SO REPORTED AND RECOMMENDED** this <u>3rd</u> day of November, 2009.


<u>s/Linda T. Walker</u>
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,    )
                               )
       Plaintiff,           )
                               )
v.                         )      CRIMINAL ACTION NO.
                               )      1:08-CR-433-JEC-LTW
ANTONIO DARNELL KING,     )
                               )
       Defendant.       )

## <u>ORDER FOR SERVICE OF REPORT AND RECOMMENDATION</u>

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b) (1), within ten (10) days after service of this order, each party may file written objections, if any, to the Report and Recommendation. Pursuant to Title 18, United States Code, Section 3161(h) (1) (F), **the above-referenced ten (10) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act.**

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and

shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court.  If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 3rd day of November, 2009.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE